IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

REMZI ARIFI,                                    Civ. No. 3:13-cv-001871-AC

          Plaintiff,                          FINDINGS &
                                              RECOMMENDATIONS
    v.

FEDEX GROUND PACKAGE SYSTEM,
INC. DBA FEDEX PACKAGE
DISTRIBUTION CENTER,

          Defendant.

ACOSTA, Magistrate Judge:

    Plaintiff Remzi Arifi ("Arifi") is a practicing Muslim and Albanian immigrant who works as a long-haul-truck driver transporting packages for Defendant FedEx Ground Packaging System, Inc. ("FedEx"). (Declaration of Laura P. Jordan ("Jordan Decl.") Ex. 4 at 1.) In October 2013, Arifi filed this matter against FedEx for discrimination under federal and state law on the basis of "race,

color, religion, and national origin." (Notice of Removal (Dkt. No. 1) Ex. 1.) FedEx now moves for summary judgment on Arifi's state and federal discrimination claims.

*Factual Background*

In August 2009, Arifi began working for Wade Transport Company ("Wade Transport") as a long-haul truck driver. (Jordan Decl. Ex. 2 at 2.) Wade Transport is a labor contractor that provides long-haul-trucking services between FedEx hubs pursuant to an operating agreement.[1] (Declaration of Ron Wade ("Wade Decl.") ¶¶ 2, 4.) Pursuant to that operating agreement, Wade Transport recruits new employees, sets their pay rate, offers benefits, pays workers' compensation benefits and unemployment insurance, and conducts training and discipline as necessary. (Wade Decl. ¶ 6.) Wade Transport also provides its drivers with a uniform to be worn during working hours. (Pl.'s Depo. at 38:2-9.) The semi-truck cabs, or "tractors," that Wade Transport employees use for long-haul trucking are owned by Wade Transport, and most minor maintenance is performed by Wade Transport employees. (Wade Decl. ¶ 7.) Although Wade Transport claims to retain the power to hire and fire employees, FedEx reserves the right to "approve" and "disqualify" drivers from hauling FedEx cargo. (Wade Decl. ¶ 13.) Pursuant to FedEx's driver-approval process, FedEx runs background checks and speaks to the driver's former employers to ensure he or she is an appropriate candidate for the position. (Pl.'s Depo. at 16:5-10.)

---

[1] Neither party introduced the operating agreement between Wade Transportation and FedEx, so Defendant's description of that document's terms is of questionable admissibility because it is likely hearsay and does not conform to the "best evidence rule." *See Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986) ("In proving the terms of a writing, where the terms are material, the original writing must be produced.") However, the contents of the operating agreement are not material to the court's analysis, and the court need not analyze the admissibility of FedEx's description of that document.

Although Wade Transport employees held staff meetings at a truck stop near Portland, Oregon, Arifi received most of his day-to-day direction from FedEx personnel. (Declaration of Remzi Arifi ("Arifi Decl.") ¶¶ 5, 13-14.) Arifi testified at deposition:

> FedEx was giving us orders where to go and what time to be. The contractor didn't do nothing. . . . We was contacted by the contractor on Tuesdays only. FedEx called the contractor on Tuesday and give them the first route where we going to. And after that, we was all dealing with FedEx, getting calls, calling them, tell them where we at, where we taking the next route and everything. So dispatch and everything going through FedEx, nothing to do with contractor.

(Pl.'s Depo. at 17:9-18.)

As a long-haul truck driver, Arifi was responsible for transporting FedEx cargo to and from the FedEx Portland Hub. (Arifi Decl. ¶ 5.) Arifi would drive a semi-truck cab, or "tractor," to the FedEx Hub where he would pick up paperwork assigning him a trailer, a cargo container, and a destination. (Arifi Decl. ¶ 5.) The destination would change occasionally, but Arifi generally drove the same route each day until he received orders to drive a different route. (Wade Decl. ¶ 6.) Occasionally, when Arifi arrived at the FedEx hub, the cargo container assigned to Arifi would be blocked in by other containers. (Arifi Decl. ¶ 8.) Unless a FedEx employee was available to free Arifi's assigned cargo container, Arifi was required to move the containers blocking his way. (Arifi Decl. ¶ 9.) This process could take up to four hours if multiple cargo containers were blocking Arifi's assigned cargo. (Arifi Decl. ¶ 9.) If a problem occurred en route, Arifi was required to contact FedEx dispatchers who would provide Arifi with instructions. (Arifi Decl ¶¶ 13-14.) If Arifi's tractor suffered a mechanical malfunction, FedEx dispatch would send a mechanic. (Arifi Decl. ¶ 14.) Similarly, if Arifi encountered a traffic problem or road closure, Arifi was required to call FedEx dispatch who would provide Arifi with an alternate route. (Arifi Decl. ¶ 13.)

While working for Wade Transport, Arifi alleges he was subject to verbal abuse by FedEx employees and long-haul contractor employees. In 2010, a FedEx dispatcher pointed to Arifi and remarked, "I wish FedEx [would] stop hiring [these] low life mother fuckers brads [sic] who don't speak 2 words of English this [place] will look much better and will make my job much [easier.]" (Jordan Decl. Ex. 3 at 1.) According to Arifi, that dispatcher continued to make similar comments on a daily basis. (Arifi Depo. at 113:17-25.) Around this same time, another FedEx dispatcher called Arifi a "fucking alien" and threatened to call immigration and ship Arifi to Mexico. (Jordan Decl. Ex. 3 at 1.)

In May 2012, Arifi was at a FedEx facility when FedEx safety manager Ryan Fleck grabbed Arifi by the shirt collar while remarking to a group of ten co-workers, "[l]ook at this guy, he looks like a terrorist!" (Jordan Decl. Ex. 4 at 2.) The insults and name calling continued. One month later, a FedEx security guard called Arifi a "fucking terrorist" and asked if Arifi had a bomb in his trailer to "blow up FedEx." (Jordan Decl. Ex. 4 at 2.) On June 12, 2012, another long-haul contractor employee said to Arifi "[h]ey you fucking terrorist did you blow up anything yet[?]" (Jordan Decl Ex 3 at 4.) Over the next few months, Arifi was referred to as a "terrorist" by long-haul contractor employees and FedEx employees at least three additional times. (Pl.'s Depo. at 108:16-22, 112:12-113:5.) Arifi and his brother, who also worked for Wade Transport, were asked by a fellow driver "[h]ow come, if you guys are terrorists, how come you guys don't wear the turbans on your heads." (Pl.'s Depo. at 116:2-16.) In all, Arifi was called a "terrorist" seven times between May 2012 and June 2013.

Arifi complained to his supervisor, who, along with FedEx manager Aaron Scott, attempted to schedule a meeting at which all parties could address Arifi's concerns. (Wade Decl. ¶ 9.) The

parties to the meeting agreed that all future incidents or inappropriate comments would be reported to Arifi's supervisor. (Wade Decl. ¶ 10.) A subsequent meeting was held in January 2013 after the inappropriate comments did not stop. (Wade Decl. ¶10.)

In March 2013, a FedEx manager called Arifi's supervisor to inform him that Arifi had falsified log books kept pursuant to Department of Transportation regulations. (Wade Decl. ¶ 13.) After initially denying it, Arifi admitted falsifying the logs. (Wade Decl. ¶ 13.) Despite Arifi's transgression, Arifi's supervisor was "able to keep FedEx . . . from disqualifying [Arifi] as a driver . . . ." (Wade Decl. ¶ 13.)

On June 24, 2013, a meeting was convened for Wade Transport employees to explain new Department of Transportation service rules. (Wade Decl. ¶ 14.) Arifi interrupted his supervisor several times with "jokes and wisecracks." (Wade Decl. ¶ 14.) Eventually, Arifi's supervisor told Arifi to "shut up." (Wade Decl. ¶ 14.) Arifi immediately left the meeting. (Wade Decl. ¶ 14.) Later, Arifi sent his supervisor a text message explaining he would no longer attend meetings or speak with his supervisor on the phone. (Wade Decl. ¶ 15.) Shortly after receiving the text message, Arifi's supervisor terminated Arifi. (Wade Decl. ¶ 15.) After being terminated, Arifi found employment through another FedEx long-haul contractor, who employs him to this day.

### *Legal Standard*

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the movant meets his burden, the nonmovant must

"go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). On summary judgment, the court is bound to view all facts in a light most favorable to the nonmovant and must draw all justifiable inferences in the nonmovant's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Discussion*

Arifi claims discrimination on the basis of religion against FedEx.[2] His claims arise under Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as Oregon civil rights statutes. FedEx now moves for summary judgment and argues that under both state and federal law: (a) Arifi cannot establish a *prima facie* case of discrimination under any of the theories he alleged; and (b) Arifi was not an "employee" subject to the protections of civil rights statutes. However, the court need not address FedEx's argument that Arifi is not an "employee" for Title VII purposes because even if he was a FedEx employee, he was not subject to discriminatory treatment under Title VII and OR. REV. STAT. § 659A.030.

I.  Discrimination

FedEx argues Arifi cannot prove the essential elements of a federal or state discrimination claim. Specifically, FedEx argues Arifi: (a) cannot prove the causal connection between his membership of a protected class and his adverse employment action; (b) cannot demonstrate a causal connection between filing a BOLI complaint and his adverse employment action; and (c) cannot show he suffered conduct sufficiently serious or pervasive to constitute a hostile work environment.

---

[2] Although Arifi alleges in his complaint that he was subject to discrimination on the basis of race, national origin, and religion, he conceded at oral argument his claims are only for religious discrimination. Therefore, the court construes Arifi's claims to allege discrimination on the basis of his Muslim faith.

FINDINGS & RECOMMENDATIONS - 6                                                                [RMD]

Arifi contested each of FedEx's arguments. Because the standards for finding discrimination under Title VII and OR. REV. STAT. § 659A.030 are identical, the court will analyze Arifi's state and federal claims concurrently.

*A. Disparate Treatment and Retaliation*

FedEx argues Arifi cannot demonstrate a genuine issue of material fact on whether he suffered disparate treatment or retaliation. Arifi contends he adequately demonstrates an issue of fact on whether FedEx's justification for his termination was pretext. However, the record does not support Arifi's argument, and the court should grant FedEx summary judgment on Arifi's disparate treatment and retaliation claims.

Courts analyze discrimination claims for disparate treatment and retaliation according to the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under that framework, the plaintiff must present enough evidence to demonstrate a prima facie case for discrimination under each theory. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993) Most notably, the plaintiff is required to put forth evidence from which the court may infer the plaintiff was subject to an "adverse employment action" on the basis of his or her membership in a protected class. *Id.* Where the plaintiff meets this initial burden, it "creates a presumption that the employer unlawfully discriminated against the employee." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 n. 8 (1981)). The burden then shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Hicks,* 509 U.S. at 507. If the defendant successfully shows innocent reasons for the adverse employment action, the burden shifts back to the plaintiff to introduce evidence which shows the defendant's nondiscriminatory reasons are pretext. *Id.*

Arifi introduced some evidence to support prima facie claims for disparate treatment and retaliation. Thereafter, FedEx established that Arifi was terminated not because he is a Muslim, but because he left the June 24, 2013 safety meeting without permission and indicated he would no longer attend meetings or speak with his supervisor via telephone. In response, Arifi argued FedEx's legitimate, nondiscriminatory reason for terminating him was pretext. According to Arifi, his supervisor deliberately tormented him during a meeting with the intent of causing Arifi's negative reaction. Thus, under Arifi's theory, his supervisor intentionally created the purported legitimate nondiscriminatory reason for terminating him. However, Arifi's contention is unsupported by the evidence on the record. The only evidence he introduces in support are deposition excerpts in which Arifi speculates about his boss's motivation for terminating him. Mere speculation is not evidence of an individual's discriminatory motive. Because Arifi does not produce evidence to support his argument for pretext, the court concludes FedEx is entitled to summary judgment on Arifi's state and federal claims for disparate treatment and retaliation.

B. *Hostile Work Environment*

FedEx contends it is entitled to summary judgment because Arifi cannot prove the essential elements of a hostile work environment claim. To prevail in a claim for hostile work environment on the basis of religion, a plaintiff must show: (1) he or she was subject to verbal or physical conduct of a religious nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2004). The conduct at issue "must be both objectively and subjectively offensive, [such] that a reasonable person would find [it] hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 787 (1998). Moreover, when applying the "reasonable person" standard, the court puts itself in the position of reasonable individual who possesses the plaintiff's characteristics. *See El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) (citing with approval the district court's reasoning that "rational jurors could find that [the defendant's] intentional conduct created a hostile work environment because is conduct was sufficiently pervasive to alter the conditions of Plaintiff's employment and to create a work environment racially hostile to a reasonable Arab.")

Title VII, however, is not a "generally civility code." *Id.* at 788. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* When analyzing whether the conduct was severe or pervasive enough to give rise to a hostile work environment, the court should consider "all the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Id.* (internal quotation marks omitted).

*Nichols v. Azteca Restaurant Ent., Inc.*, 256 F.3d 864 (9th Cir. 2001), provides an example of conduct sufficiently severe and pervasive to create a hostile work environment. There, a male waiter at a restaurant was repeatedly referred to as "she" and "her" by his coworkers, was "mocked for walking and carrying his serving tray like a woman," and constantly called names such as "faggot" and "fucking female whore." *Id.* at 870. The remarks were persistent. *Id.* "[T]he abuse occurred at least once a week and often several time a day" over a period of several years. *Id.* The plaintiff brought a Title VII hostile work environment claim. *Id.* at 869. After a bench trial, the court entered a judgment as a matter of law in defendant's favor and the plaintiff appealed. *Id.* The Ninth Circuit reversed, and disagreed with the trial court's characterization that the plaintiff had been

"teased on occasion." *Id.* Instead, the court determined that "a reasonable man would have found the sustained campaign of taunts . . . sufficiently severe and pervasive to alter the terms and conditions of his employment" in part because the comments were "designed to humiliate and anger" the plaintiff. *Id.* at 873.

Another example of conduct found sufficiently pervasive, it need not be to constitute a hostile work environment is *El Hakem v. BJY, Inc.*, 415 F.3d at 1077. In *El-Hakem*, the plaintiff, whose full name was Mamdouh El-Hakem, brought a hostile work environment claim on the basis of race. *Id.* at 1073. The plaintiff alleged that his former supervisor urged him to go by "Manny" instead of Mamdouh because it would "increase [the plaintiff's] chances for success and would be more acceptable to [the defendant's] clientele." *Id.* at 1072. The plaintiff proposed a compromise, and asked his supervisor if he could go by "Hakem," but his supervisor declined the plaintiff's proposal and suggested "Hank" instead. *Id.* at 1073. For the next eleven months, the plaintiff's supervisor referred to plaintiff as "Manny" several times per week, especially during conference calls with clients and colleagues. *Id.* at 1074.

After a five-day trial, the jury concluded the plaintiff suffered a hostile work environment on the basis of his race and rendered a decision in his favor. *Id.* at 1072. The defendant filed a motion for judgment as a matter of law, which the trial court denied. The court reasoned, "rational jurors could find that [the defendant's] intentional conduct created a hostile work environment because his conduct was sufficiently pervasive to alter the conditions of plaintiff's employment and to create a work environment racially hostile to a reasonable Arab." *Id.* at 1074 (quoting 262 F. Supp. 2d 1139, 1146) (brackets omitted). On appeal, the Ninth Circuit affirmed the trial court's decision and concluded, "[a]lthough [the defendant's] conduct may not have been especially severe, there was

unrefuted evidence of its frequency and pervasiveness." *El-Hakem*, 415 F.3d at 1073. On that basis, the court affirmed the district court's decision denying defendant's motion for judgment as a matter of law and upheld the jury's verdict in favor of plaintiff. *Id.* at 1074.

Courts have generally found that being called a "terrorist" is not a severe insult which may give rise to a hostile work environment upon one utterance, and instead have generally required a continuous and pervasive course of insults to constitute a violation of Title VII. For example, in *E.E.O.C. v. WC&M Ents., Inc.*, 496 F.3d 393 (5th Cir. 2007), the plaintiff was a practicing Muslim and Indian immigrant who filed a discrimination claim against his former employer. *Id.* at 396. The plaintiff "began having problems with harassment . . . immediately following the September 11, 2001 terrorist attacks." *Id.* On that day, when the plaintiff arrived at work, his coworkers were watching news coverage. *Id.* The coworkers asked, "[w]here have you been?" in a mocking way that implied the plaintiff participated in some way in the terrorist attacks against the United States. *Id.* When the United States commenced a military action in Afghanistan, the plaintiff's coworkers and manager began calling him "Taliban" multiple times per day. *Id.* Later, the plaintiff was asked "Why don't you just go back where you came from since you believe what you believe?" *Id.* at 397.

More than a year after the harassment had begun, the plaintiff disputed his manager's requirement the plaintiff attend a "mandatory" United Way Meeting. *Id.* When the plaintiff asked why the meeting was mandatory, his manager responded "This is America. That's the way things work over here. This is not the Islamic country where you come from." *Id.* Shortly after this exchange, the manager "issued [the plaintiff] a written warning, which stated that [the plaintiff] 'was acting like a Muslim extremist' and that he could not work with [the plaintiff] because of his 'militant stance.'" *Id.*

The plaintiff filed a claim for hostile work environment on the basis of religion and national origin, but the district court granted the defendants' motion for summary judgment. *Id.* On appeal, the Fifth Circuit reversed and held that because the abuse occurred on a daily basis for more than a year, it was pervasive enough to create a genuine issue of material fact regarding whether the plaintiff was subject to a hostile work environment. *Id.* The court reasoned: "Although no single incident of harassment is likely sufficient to establish severe or pervasive harassment, when considered together and viewed in the light most favorable to [the plaintiff], the evidence shows a long-term pattern of ridicule sufficient to establish a claim under Title VII." *Id.* at 401.

Where harassment is more isolated and does not persist over time, a court may still find a hostile work environment where the abuse is sufficiently severe. The abuse at issue must be grossly offensive, and courts seldom find that a single incident creates a hostile work environment. One case which illustrates the exception is *Alkhawaldeh v. Nairn Concrete Servs., Inc.*, Civ. Action No. 14-2140, 2015 WL 3485955 (E.D. La. June 2, 2015). There, the plaintiff brought a hostile work environment claim against his employer after he suffered a course of abusive treatment at the hands of his coworkers. *Id.* at *2. The plaintiff, who was a practicing Muslim, established that one day when in his supervisor's office, the supervisor "typed on his computer, stood up, and asked [the plaintiff] in a loud voice if he knew why [the supervisor] did not like Arabs and Muslims." *Id.* at *2. The supervisor then showed the plaintiff a video of an individual being decapitated by a group of Islamic terrorists. *Id.* at *2. The plaintiff fled the office and told a coworker the video made him fear for his life. *Id.* The court denied the defendant's motion for summary judgment and held that "[t]he beheading video incident alone was severe enough to" create a genuine issue of material fact and defeat the defendant's motion. *Id.* at *16.

Here, Arifi does not establish a genuine issue of material fact that the harassment he faced was severe or pervasive enough to alter the terms of his employment. First, the abuse Arifi faced was not sufficiently pervasive; it was not the "persistent" conduct necessary to support a finding of pervasiveness. Unlike *Nichols*, *El-Hakem*, and *WC&M Ents.*, where the plaintiffs faced insults and abuse on a near-daily basis for six months or more, Arifi faced only seven instances in thirteen months.

Second, although the insults Arifi faced were offensive, taken individually or collectively, they were not so severe as to give rise to a hostile work environment. The "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc*, 523 U.S. 75, 81-82 (1998). Referring to someone of the Muslim faith as a "terrorist" qualifies as an offensive comment for Title VII purposes as other courts have found. *See, e.g. WC&M Ents., Inc.*, 496 F.3d at 395 (hostile work environment when the plaintiff was called a "terrorist" and "Taliban" persistently for months), *Ashraf-Hassan v. Embassy of France in U.S.*, 878 F. Supp. 2d 164 (D. D.C. 2012) (denying the defendant's motion to dismiss where the defendant's employees referred to the plaintiff as a "terrorist," asked her "not to wear the hijab or any jewelry identifying her religion, and commented that the plaintiff should "go back to where [she] came from."), *Alzuraqi v. Group 1 Automotive, Inc.*, 921 F. Supp. 2d 648 (N.D. Tex. 2013) (finding genuine issues of material fact on a hostile work environment claim where the plaintiff was referred to as "towelhead; raghead; rock thrower; sand nigger; terrorist; fucking Palestinian; and fucking Muslim") (internal quotation marks omitted).

Unlike the abuse faced by the plaintiffs in *Alkhawaldeh,* the insults Arifi faced were not so pervasive or severe such that one or several incidents created a hostile work environment.

Third, although a FedEx manager made some physical contact with Arifi during the May 30, 2012 incident, the abuse at issue in this case was not "physically threatening or humiliating." On May 30, 2012, FedEx manager Ryan Fleck grabbed Arifi's shirt collar and, in front of ten FedEx employees, remarked that Arifi looked like a "terrorist." However, there is no evidence Arifi felt threatened by the physical contact, or that Fleck intended the gesture to be intimidating or "physically threatening." The remaining instances of abuse at issue in this case were "mere offensive utterances."

Fourth, Arifi presents no evidence that his coworkers' conduct unreasonably interfered with his work. In fact, Arifi's work consisted primarily of driving alone in his tractor while transporting cargo from one FedEx hub to another FedEx hub. The record contains no evidence that Arifi suffered religiously motivated harassment while performing his primary job duty, driving his semi-tractor with FedEx packages.. Further, Arifi presented no evidence that his work suffered as a result of the harassment he faced on FedEx property. Thus, the court concludes Arifi was not subject to a hostile work environment on the basis of his religion.

*Conclusion*

For the aforementioned reasons, the court should GRANT FedEx's Motion for Summary Judgment (Dkt. No. 19) and enter a judgment in FedEx's favor.

*Scheduling Order*

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due July 27, 2015. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 13th day of July, 2015.

JOHN V. ACOSTA
United States Magistrate Judge